United States District Court
Southern District of Texas
**ENTERED**
April 06, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **TIMOTHY KLICK**, *et al.*, | § |
| | § |
| Plaintiffs, | § |
| | § |
| VS. | § CIVIL ACTION NO. 4:19-CV-01583 |
| | § |
| **CENIKOR FOUNDATION**, | § |
| | § |
| Defendant. | § |

## MEMORANDUM & OPINION

The Court held a hearing on Plaintiffs' Consolidated Motion for Certification and Notice to Potential Opt-in Plaintiffs (Doc. 153) on March 25, 2022. The Court took the motion under advisement. It now **GRANTS** the motion for the reasons set forth below.

### I. BACKGROUND

Cenikor holds itself out as a drug rehabilitation program employing the Therapeutic Community model of therapy. This model generally aims to teach social functioning and education and vocational skills to participants through a highly regulated regimen with clearly stated expectations. *See* Doc. 166 at 3. Cenikor maintains, or previously had, program locations in Austin, Houston, Fort Worth, Killeen, San Marcos, Temple, Tyler, and Waco, Texas, as well as Baton Rouge, Louisiana.

Cenikor's corporate representative, Chief Financial Officer Matthew Kuhlman, testified as to the three phases of Cenikor's long-term residential program: orientation, primary phase, and reentry phase. According to Cenikor's Program Manual, orientation lasts 21-60 days, the primary

phase lasts between 16-18 months, and reentry lasts 3-6 months. Pls.' Appx. at 67; *id.* at 73.[1] These phases remained unchanged from at least March 1, 2016, until the summer of 2021. Pls.' Appx. at 9, Kuhlman Depo. 31:18-24; *id.* at 50-53, 283:21-286:16.

### A. Program Entry and Orientation

Cenikor does not always charge its participants for its services. Many are eligible to participate for free or at a reduced rate, while others pay a modest amount upfront at the time of onboarding. *See*, *e.g.*, Def.'s Exhibit C, Chambers Depo. 119:16-20 (no entry fee in 2018); Def.'s Exhibit D, Potter Depo. 80:5-15 (no entry fee in 2017); Def.'s Exhibit E, Sorey Depo. 36:13-37:10 (testifying that Cenikor waived a "big portion of the fee.").

All Cenikor participants signed agreements providing that (1) work and vocational training are an essential part of the treatment process; (2) the participant is not an employee and will not receive compensation for that work or vocational training; and (3) any money that Cenikor collects from its community partners will be used to partially offset the cost of the participant's treatment and care. Def.'s Exhibit A, ¶ 6; Def.'s Exh. A-2; Def.'s Exh. A-3. Upon entry into Cenikor, each participant meets with a licensed counselor to develop a rehabilitation treatment program based on the individual's circumstances. *See*, *e.g.*, Def.'s Exhibit H, Woods Depo. 2 88:15-94:21, Exh. 81.

### B. Primary Phase

The intake documents also stated that admission into Cenikor was based on the "ability to participate in all aspects of the program's regimen, including, but not limited to . . . participation in the pre-employment training program, i.e., Vocational Services." It further stated that if a

---

[1] Mr. Kuhlman testified that the primary phase typically lasted 16-18 months and that he was not aware of any program participant making it through the primary phase in less than 12 months. Pls.' Appx. at 14-15, Kuhlman Depo. 62:10-63:5.

participant is "unable to participate," "[the participant] will be subject to termination from Cenikor." Pls.' Appx. at 131.

While Defendant refers to this aspect of the "primary phase" as "work and vocational therapy," Plaintiffs refer to it as the core of Cenikor's "Work Program." Regardless of these labels, the primary phase is at the center of this litigation. Plaintiffs allege that, while participating in the primary phase, they were required to work over 40 hours per week and were not paid for any hours worked. Since May 2016, 2,736 individuals have participated in the primary phase. Pls.' Appx. at 54-55, Kuhlman Depo. 292:15-293:1.

As part of its primary phase, Cenikor contracted with third parties, typically for-profit companies called "Vocational Business Partners." *Id.* at 17-18, 105:16-106:13. All primary phase participants were assigned to work either outside of the Cenikor facility with a Vocational Business Partner or in-house at the Cenikor facility. *Id.* at 11, 48:4-17.

Cenikor's Program Manual set forth policies and procedures that applied across all Cenikor facilities. *Id.* at 16, 77:8-14 ("Q: [D]oes that program manual apply to the long-term residential program across Cenikor's facilities, or is there a separate program manual for each facility? A: This program manual is for our entire organization."). During the primary phase, participants were required to live at Cenikor's facilities and could not possess money. *Id.* at 11-12, 48:18-49:22. Cenikor provided food, clothing, and medical care to the primary phase participants. *Id.* at 12-13, 49:23-50:18. All participants were covered by worker's compensation insurance for which Cenikor paid, *id.* at 37-38, 251:21-252:3l; Cenikor marketed this worker's compensation coverage to prospective participants. *Id.* at 39, 261:5-24. Cenikor could remove a program participant from a job assignment at the request of a Vocational Business Partner. *Id.* at 40-42, 264:24-266:10.

Cenikor decided which participants were assigned to which Vocational Business Partner. *Id.* at 19, 113:5-9; *Id.* at 20, 120:4-14. If a Vocational Business Partner wished to change the job duties of a program participant, per its contract with Cenikor, it had to obtain Cenikor's approval before doing so. *Id.* at 42, 266:11-22. A participant's refusal to perform a work assignment could lead to termination from the program and removal from Cenikor's facilities. *Id.* at 21-26, 138:5-143:7; *see also* Pls.' Appx. at 68, Cenikor Program Manual (stating that program participants "[m]ust be willing to adhere to all Rules and Guidelines of the Cenikor Program or face consequences including possible termination from the Program.").

Vocational Business Partners were billed by Cenikor for the hours expended by program participants. Pls.' Appx. at 28, Kuhlman Depo. 158:9-20. For the one-year period beginning July 1, 2017, Cenikor billed its Vocational Business Partners over $7.2 million dollars for the labor of its program participants. *Id.* at 32, 196:2-17. The following year, Cenikor invoiced around $6.9 million dollars to its Vocational Business Partners. *Id.* at 32, 196:21-25.

The Vocational Business Partners paid Cenikor based on contractually agreed rates. *Id.* at 28, 158:9-20. *See also id.* at 31, 187:2-22. To the extent a program participant worked more than 40 hours in a week, Cenikor charged the Vocational Business Partner an overtime premium of 1.5 times the regular hourly rate. *Id.* at 30, 185:1-5. The contracts between Cenikor and Vocational Business Partners provided:

> *Vocational workers are presumed to be nonexempt from laws requiring premium pay for overtime and holiday work, or weekend work. CENIKOR will charge customer special rates for premium work time only when a Vocational Worker's work on assignment to CUSTOMER, viewed by itself, would legally require premium pay and CUSTOMER has authorized, directed, or allowed the Vocational Worker to work such premium work time. CUSTOMER'S special billing rate for premium hours will be the same multiple of the regular rate as CENIKOR is required to apply for the vocational workers' regular pay rate (For example, when Federal law requires 150 percent of pay for work exceeding 40 hours a week)."*

Pls.' Appx. at 159-160; *see also* Pls.' Appx. at 45-49, Kuhlman Depo. 273:16-277:14. Mr. Kuhlman confirmed this practice:

> *Q. So I want to ask you about that second sentence of paragraph 4. It says: "Overtime charges will apply after 40 hours per week per vocational worker and will be calculated at 1 1/2 times the rate set forth or Exhibit A." Do you see that?*
> *A. Yes.*
> *Q. So Cenikor's customers were required to pay overtime 1 1/2 times the regular rate any time a program participant exceeded 40 hours in a week; is that correct?*
> *A. That's the agreement that we had with the vocational partners.*

*Id.* at 43-44, 268:7-269:5. Participants received no monetary compensation during the primary phase, regardless of whether they had worked over 40 hours in a week.[2] *Id.* at 29, Kuhlman Depo. 178:4-7.

Defendant notes that the primary phase provided participants the resources to obtain GEDs or college credits toward a degree. Def.'s Exhibit A, ¶ 4.

### C. Reentry Phase

While not all participants "graduated" Cenikor's residential program, those that did had to, for example, become sober, have a place to live, obtain a full-time job, open a bank account, and secure a reliable mode of transportation. *See* Def.'s Exhibit D, Potter Depo. 42:14-22; Pls.' Appx. at 67.

Plaintiffs allege that program participants who made it to the reentry phase continued working the same jobs as during the primary phase but began earning money from them and were required to pay Cenikor rent and transportation fees. Doc. 172 at 2.

---

[2] Although Cenikor invoiced its customers overtime rates whenever participants worked more than 40 hours in a week, reportedly for tax purposes, it maintains that it was not itself required to pay any overtime to participants.

### D. Procedural History

The *Klick* lawsuit was filed on May 1, 2019, and five similar Federal Labor Standards Act ("FLSA") lawsuits were subsequently filed against Cenikor. Two were originally filed in this District, and the other three were transferred here under the first-to-file rule.[3] All six cases were consolidated, with *Klick* as the lead case, on February 25, 2020. Doc. 60.[4] Shortly after this case was filed, the Plaintiffs in *Aleem*, *Klick* and *Sorey* each filed motions for conditional certification under the *Lusardi* framework for conditional certification under the FLSA. *See Klick* Doc. 15; *Aleem* Doc. 8; *Sorey* Doc. 12; *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987). Klick subsequently withdrew his conditional certification motion, and the Court denied the *Aleem* and *Sorey* conditional certification motions without prejudice in light of the Fifth Circuit's decision in *Swales v. KLLM Transport Services, LLC*, 985 F.3d 430 (5th Cir. 2021). Doc. 134.

The parties have exchanged written discovery. Depositions of the named plaintiffs and a 30(b)(6) corporate representative of Cenikor have been taken. During the case's pendency, over 200 primary phase participants have filed consent forms with the Court indicating their desire to join the consolidated cases. *See*, *e.g.*, *Klick* Docs. 5, 8, 14, 16, 23, 33, 40, 47, 49, 69, 76, 88, 118, 132.

---

[3] *See Sorey v. Cenikor Foundation*, Case No. 4:19-cv-03033 (S.D. Tex.), formerly Case No. 3:19-cv-00267 (M.D. La.); *Aleem v. Cenikor Foundation, Inc.*, Case No. 4:19-cv-03032 (S.D. Tex.), formerly Case No. 3:19-cv-00268 (M.D. La.); *Potter v. Cenikor Foundation, Inc. et al.*, Case No. 4:19-cv-03031 (S.D. Tex.), formerly Case No. 3:19-cv-00294 (M.D. La.); *Williams v. Cenikor Foundation, et al.*, Case No. 4:19-cv-02828 (S.D. Tex.), formerly Case No. 1:19-cv-00229 (E.D. Tex.); *Woods v. Cenikor Foundation*, Case No. 4:19-CV-4569 (S.D. Tex.).

[4] One of the cases, *Williams*, has since been severed and deconsolidated from this case. *Klick*, *Sorey*, *Potter*, *Aleem* and *Woods* remain part of this consolidated action.

## II. MOTION FOR CERTIFICATION

Plaintiffs move for certification of a proposed class of individuals who participated in the primary phase of Cenikor's long-term residential program from May 2016 to the present and performed work for outside businesses or individuals without monetary compensation.

### A. Legal Standard

As this Court observed in another case, *Alvarez v. NES Global LLC*, No. 4:20-CV-1933, 2021 WL 3571223 (S.D. Tex. Aug. 11, 2021), the Fifth Circuit recently discarded the long-used *Lusardi* two-step approach in which a district court would first consider the issue of whether a collective should be conditionally certified, followed by a notice and opt-in period, then a decertification stage. *See Swales*, 985 F.3d 430.

In lieu of this old approach, *Swales* instructs that "a district court must rigorously scrutinize the realm of 'similarly situated' workers, and must do so from the outset of the case, not after a lenient, step-one 'conditional certification.' Only then can the district court determine whether the requested opt-in notice will go to those who are actually similar to the named plaintiffs." *Id.* at 434. In other words, the district court proceeds directly to step two of *Lusardi*—the "similarly situated" inquiry—with the benefit of pre-certification discovery if needed.

"While [the similarly situated] inquiry does not mean that the class members must be identically situated, it does mean that the Plaintiff must show a 'demonstrated similarity' among the purported class members, as well as a 'factual nexus' that binds the class members' claims together such that hearing the claims in one proceeding is fair to all parties and does not result in an unimaginable trial of individualized inquiries." *Cotton-Thomas v. Volvo Grp. N. Am., LLC*, No. 3:20-CV-113, 2021 WL 2125003, at *2 (N.D. Miss. May 25, 2021) (citing *Swales*, 985 F.3d at 443). "In general, in order to determine if purported class members are sufficiently similarly

situated, courts consider (1) the factual and employment settings of the purported class members; (2) the various defenses available to the defendant and if any defenses are individualized rather than applying to the class as a whole; and (3) fairness and procedural considerations." *Id.* (citing *Swales*, 985 F.3d at 437).

### B.  Discussion

Plaintiffs argue that the ultimate issue—whether primary phase participants were employees of Cenikor—can be determined collectively for the following reasons:

- Cenikor had a company-wide policy of classifying its program participants as volunteers and providing them no monetary compensation during the primary phase.
- All program participants lived at Cenikor facilities under the same Cenikor policies.
- All program participants received the same in-kind benefits, including housing, food, emergency medical care, and clothing. All participants were covered by Cenikor's worker's compensation insurance.
- All program participants signed the same intake documents, which required them to work as directed by Cenikor, allowed Cenikor to expel them at any time, and authorized Cenikor to send them notices by text or email after leaving the program.

Based on these facts, Plaintiffs assert that Cenikor had a uniform, company-wide policy of denying primary phase participants minimum wage and overtime pay regardless of the number of hours they worked in any given week. They further contend that Cenikor exercised significant, even absolute, control over all participants in the program.

Accordingly, Plaintiffs argue that they have established that they are similarly situated members of the potential class and that the Court can decide collectively the central question in this case: Was time spent working for third parties by primary phase participants compensable

under the FLSA? They analogize this case to actions certified in other districts under, they argue, similar circumstances. *See T.S. v. The Burke Foundation*, No. 1:19-CV-809-RP, 521 F.Supp.3d 691 (W.D. Tex. Feb. 22, 2021) (post-*Swales*, certifying collective action of plaintiff-participants of residential treatment center for minor boys with emotional issues, reasoning that the central issue—whether the program participants were volunteers or employees under the FLSA—"is an issue that can be adjudicated on a class-wide basis"); *Fochtman v. DARP, Inc.*, No. 5:18-CV-5047, 2019 WL 4740510 (W.D. Ark. Sept. 27, 2019) (in a case currently on appeal to Eighth Circuit, granting Rule 23 certification to a class of participants in a residential drug rehabilitation program who signed paperwork stating that they would not be paid monetarily for participating in the work program but would be provided food, housing, clothing, and other necessities).

Should the Court certify this action based on that central question, Plaintiffs argue, the Court should then apply the Fifth Circuit's economic realities test to determine the employment status of the primary phase participants. That test focuses on five non-exhaustive factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship. *Hopkins v. Cornerstone America*, 545 F.3d 338, 343 (5th Cir. 2008) (citing *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043-44 (5th Cir.1987). No single factor is determinative. *Id.* Rather, each factor is a tool used to gauge the economic dependence of the alleged employee, and each must be applied with this ultimate concept in mind. *Id.* Plaintiffs argue that this test is applied even where the putative employee herself argues she is a volunteer, since the subjective beliefs of the alleged employer or employee are irrelevant to a worker's status. *See Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S.

9 / 20

290, 301 (1985) ("The test of employment under the Act is one of economic reality."); *see also Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1049 (5th Cir. 1987) ("Subjective beliefs cannot transmogrify objective economic realities."); *Cordero v. Voltaire, LLC*, No. A-13-CA-253-LY, 2013 WL 6415667, at *10 (W.D. Tex. Dec. 6, 2013) ("[A]lleging that Plaintiffs should be estopped from pursuing this FLSA action . . . is not a valid defense under the FLSA because an employee's subjective opinion of his employee status does not change his status under the FLSA."); *Tran v. Thai*, No. CIV.A. H-08-3650, 2010 WL 5232944, at **7-8 (S.D. Tex. Dec. 16, 2010) (rejecting argument that employee should be estopped from claiming employee status under FLSA because employee had previously claimed independent contractor tax benefits, and noting that subjective belief cannot change employee status).

Plaintiffs further argue in their motion that no defenses would apply on an individualized basis. They contend that none of the FLSA's so-called white-collar exemptions (executive, administrative, or professional) could apply, since they apply only to salaried workers. (Defendant, however, counters that other individualized defenses are relevant, *see below*.)

Finally, Plaintiffs argue that fairness and procedural concerns warrant certification, citing the large number of participants who have already opted into the class (over 200), the 2,736 members of the proposed class, judicial economy, and the risk of inconsistent results should certification be denied.

       **i.**     ***Defendant's Response***

Defendant counters that: (1) Plaintiffs cannot prove they were similarly situated with respect to the threshold issue whether they were FLSA employees because they knew they would not receive compensation; (2) even if the Court applies the economic realities test, it would have

to analyze each participant's individual circumstances; and (3) certain of Cenikor's defenses are asserted on an individualized basis and do not apply to the proposed class as a whole.

### a. Whether the Court Can Decide the Central Question

First, Cenikor argues that the expectation of compensation determines employee status. It notes that all participants had to sign an agreement upon beginning the primary phase that they would not receive any payment for its work aspect. Because they knew they would not be compensated, Defendant argues, they could not be employees as a matter of law, and this collective action cannot be certified based on the question whether they were.

Defendant attempts to distinguish *Alamo*, on which Plaintiffs rely to argue that subjective belief is irrelevant to the determination of an individual's employee status. However, Defendant conflates "no expectation of compensation" with "no expectation of *monetary* compensation." In *Alamo*, the Supreme Court considered whether "former drug addicts, derelicts, or criminals" were "employees" of a nonprofit religious organization. 471 U.S. 290. While working for the organization's commercial businesses, the workers received "no cash salaries, but the Foundation provide[d] them with food clothing, shelter, and other benefits." The Secretary of Labor failed to identify a single worker that "viewed his work . . . as anything other than 'volunteering' his services to the Foundation." Even so, the court affirmed that given their long-term reliance on the organization, the workers "expected to receive in-kind benefits" for their labor. The court approved of the district court's observation that these benefits are "wages in another form."

Similarly, here, while program participants may have known they would not be paid during the primary phase, they nonetheless understood that they would be provided with in-kind benefits. Cenikor's Consent for Services agreement confirms that program participants agree to work for commercial businesses and individuals and, in exchange, expect Cenikor to provide them with in-

kind benefits, such as housing, food, medical care, and clothing. *See* Pls.' Appx. at 154. That program participants who proceeded to the reentry phase had to pay Cenikor for rent and transportation fees supports Plaintiff's argument that individuals needed to work to earn benefits. Cenikor points out that it provided similar benefits to participants during orientation without requiring them to work for commercial businesses, as well as to certain individuals who worked in-house at the Cenikor facilities, but this is irrelevant; Plaintiffs only seek certification as to primary phase participants who performed work for outside businesses or individuals without monetary compensation.

Further, Defendant relies on cases from other circuits to support its contention that the Court should not apply the economic realities test. These cases are distinguishable. For example, Cenikor cites the Ninth Circuit's decision in *Williams v. Strickland*, 87 F.3d 1064 (9th Cir. 1995). There, the Ninth Circuit found that a participant in the Salvation Army's rehabilitation program was not an "employee" under the FLSA. *Williams* turned on whether the worker expected to receive in-kind compensation for his work. The Ninth Circuit held that he did not because his work did not contemplate compensation, but only for his own rehabilitative purposes. *Id.* at 1067. There was no indication Williams was required to work at all; he testified that he wanted to work to get in the habit of working. *Id.* Further, Williams registered for and turned over public assistance funds and food stamps to offset the costs of his room, board, and clothing. Given the court's determination that Williams' work was not mandatory, these government benefits were the primary offset for his room and board. *Id.* Here, in contrast, Cenikor collected nearly fourteen million dollars from its Vocational Business Partners for the work of primary phase participants in 2017 and 2018 alone.

Additionally, Defendant points to *Vaughn v. Phoenix House Programs of New York*, 957 F.3d 141 (2d Cir. 2020). There, the plaintiff neither expected to receive compensation for his work *nor* alleged that his work was performed in exchange for in-kind benefits. The district court below also noted that the work he was asked to complete "was not on behalf of any private, for-profit enterprise[], and was not directed toward the produc[tion] of goods or services that are sold in commerce." *Vaughn v. Phoenix House Found., Inc.*, No. 14-CV-3918 (RA), 2019 WL 568012, at *7 (S.D.N.Y. Feb. 12, 2019).

Finally, *Acosta v. Cathedral Buffet, Inc.* is also distinguishable. 887 F.3d 761 (6th Cir. 2018). There, the Sixth Circuit concluded that the volunteers were not "employees," as they had no expectation of compensation:

> *It is undisputed that the volunteers were not economically dependent upon Cathedral Buffet in any way; the parties stipulated as much before trial. The volunteers neither expected nor received any wages or in-kind benefits in exchange for their service . . . Put simply, there was no economic relationship between the restaurant and the church member volunteers. Because the volunteers did not work in expectation of compensation, the threshold remuneration requirement fails.*

*Id.* Thus, the Sixth Circuit did not proceed to the economic realities test. Unlike the plaintiffs in *Cathedral Buffet*, who could work for the church or not as they pleased, Plaintiffs here were required to work, could not possess money, and were economically dependent on Cenikor for 16-18 months.

Based on the above, the Court concludes that it is appropriate to apply the Fifth Circuit's economic realities test to determine whether Cenikor's primary phase participants, who expected at least in-kind benefits for their work, were employees under the FLSA.

### b. Whether Plaintiffs' Circumstances Must Be Individually Analyzed

Defendant argues that, even if the Court applied the economic realities test, it will necessarily have to perform this analysis on an individualized basis. Defendants cites differences

13 / 20

in Plaintiffs' deposition testimonies as to whether and how they thought they should have been paid. This is irrelevant, since the question whether plaintiffs were employees must be determined by objective economic reality, rather than their subjective beliefs. *See Alamo*, 471 U.S. at 301 ("The test of employment under the Act is one of economic reality."). Here, it undisputed that, while all program participants signed paperwork disclaiming employee status and stating they would not be paid during the primary phase, the same paperwork also promised that Cenikor would provide them "all basic personal needs including housing, food, emergency medical care, and clothing." All primary phase participants agreed to perform work to receive these in-kind benefits. The participants were thus subject to a class-wide policy.

Cenikor also cites the Second Circuit case *Vaughn*, discussed above, for its application of the "primary beneficiary" analysis. However, as Defendant conceded during the hearing, that test has not been endorsed by the Fifth Circuit in the context of rehabilitation services. And even if the test applied, Cenikor's argument would be unavailing. Cenikor argues that, because Plaintiffs had different experiences during its program (e.g., individualized treatment plans, different medical services), the question whether each program participant was a primary beneficiary of the Cenikor program is individualized. However, the primary beneficiary test examines the *structure* of the program and the relationship of the parties, rather than individual outcomes, to determine employment status. Indeed, the Supreme Court in *Walling v. Portland Terminal* case, on which the Second Circuit relied in creating its version of the primary beneficiary test, analyzed the structure of the training program to determine that the workers were not covered as employees under the FLSA. 330 U.S. 148, 152-153 (1947). Here, all program participants received their work assignments and schedules from Cenikor and were subject to the same policies and procedures.

### *c. Whether Defenses Are Individualized*

Defendant argues that several of its defenses—the Motor Carrier Act ("MCA") exemption, the *Rooker-Feldman* doctrine, and Cenikor's "offset defense"—require individualized analysis. First, the MCA does not apply to Plaintiffs' *minimum wage* claims; it applies only to the maximum hour provisions of the FLSA. *See* 29 U.S.C. §213(b)(1) and 29 U.S.C. § 206; s*ee* also 29 C.F.R. 782.1 ("Section 13(b)(1) of the Fair Labor Standards Act [the MCA exemption] provides an exemption from the maximum hours and overtime requirements of section 7 of the act, but not from the minimum wage requirements of section 6.").

To support its argument that its MCA defense should preclude certification, Cenikor cites deposition testimony of two program participants, Anthony Woods and Randy Edward Pouncy, who stated that they loaded 18-wheelers. Mr. Woods' testimony raises questions as to whether he would meet the MCA exemption. First, there is no evidence that he was loading trucks that belonged to ATCO, one of Cenikor's Vocational Business Partners, while he was working there; this is essential for him to qualify for the MCA exemption. *See* 29 C.F.R. § 782.5(a) (defining a loader as "an employee of a carrier . . . whose duties include, among other things, the proper loading of his employer's motor vehicles . . . .) (emphasis added); *see also Piazza v. Associated Wholesale Grocers Inc.*, No. CV 17-10289, 2019 WL 1862644, at *3 (E.D. La. Apr. 25, 2019) (finding MCA exemption not applicable because plaintiff loaded vehicles that did not belong to his employer). Perhaps more importantly, there has been no contention that any carriers, rather than Cenikor, were the participants' "employers" during the primary phase. Second, Mr. Woods also testified he was "not sure" while working at GP&C, another Vocational Business Partner, where the goods he loaded were being taken. *See* 29 C.F.R § 782.5 ("The section 13(b)(1) exemption applies . . . to an employee whose job involves activities consisting wholly or in part of

15 / 20

doing, or immediately directing, a class of work defined . . . (2) as directly affecting the safety of operation of motor vehicles in interstate or foreign commerce within the meaning of the Motor Carrier Act . . . ."). Cenikor Exhibit H; Woods Depo. 38:16-39:4. The other deponent, Mr. Pouncy, is not part of the collective proposed here; he is one of the two plaintiffs in the *Williams* case, which has been severed from the consolidated cases.

Cenikor also argues that the *Rooker-Feldman* doctrine precludes certification. But the Court previously denied Cenikor's Motion to Dismiss based on the *Rooker-Feldman* doctrine. *See* Minute Entry dated February 9, 2021. This issue has already been briefed and determined by the Court as to Plaintiffs Aleem and Potter. Defendant presents no evidence that the Court would conclude differently as to other participants. As this Court has previously noted, however, "later developments in the case, pertaining to the merits of [a] defense . . . may make relevant individual differences among the members of the proposed collective that are not relevant now." *Alvarez*, No. 4:20-CV-1933, 2021 WL 3571223, at *4 n.3.

Finally, Cenikor added at the hearing that its "offset defense" necessitates individualized analysis. That is, Defendant argues, liability determinations would require individualized calculations based on Cenikor's costs of providing rent, housing, food, medical care, clothing, etc., to participants, as offset by payments from the Vocational Business Partners for the hours of labor the participants expended. Plaintiff countered that, if necessary, these calculations could be completed on a class-wide basis—for example, by subtracting aggregate costs from aggregate payments and dividing by the number of participants to determine an average. In any event, the Court finds that Defendant's arguments as to damage calculations are premature at this certification stage; they will not be considered here.

Based on the above, the Court concludes that it can determine collectively the central question whether the primary phase participants were employees under the FLSA. The proposed class members were all subject to a company-wide policy under which they performed labor without monetary compensation. Given this factual nexus, it would be in the interest of fairness, judicial economy, and consistency to adjudicate Plaintiffs' claims as a collective action rather than through potentially hundreds of individual actions. The Court therefore **GRANTS** Plaintiffs' Motion for Certification.

### III. CENIKOR'S PRIVACY ARGUMENT AND DISSEMINATION OF NOTICE

Aside from its arguments on employment status, Cenikor argues that the privacy rights of participants, many of whom received substance abuse treatment during the program, prevent certification. This argument is unavailing.

First, Plaintiffs do not seek medical records or similarly intrusive information regarding the proposed class members. Instead, Plaintiffs seek only their names and contact information. Cenikor claims that the notice itself would offend the program participants' privacy rights and discourage future participation. However, Cenikor's own intake documents authorized it to send notices to the program participants via text and email. Pls.' Appx. at 155. Per the Consent for Services agreement, all program participants "[gave] permission to Cenikor Foundation to contact [them] via phone and/or email for all phone numbers and email addresses provided during admission and for a period of up to three (3) years following discharge in order to collect follow up data." *Id.* All program participants signed the Consent for Services and went forward with the primary phase, so the prospect of later receiving notices regarding their time at Cenikor did not discourage them from participating. Moreover, Cenikor discontinued its long-term residential

program in the summer of 2021, Pls.' Appx. at 50-53, Kuhlman Depo. 283:21-286:16, so no one can be discouraged from participating in that aspect of Cenikor's programming.

Second, courts have ordered disclosure of records containing treatment information when privacy objections were outweighed by an interest in redressing potential violations of substantive federal law. In those cases, court have held that privacy issues can be adequately addressed through safeguards governing the disclosure of the information. For example, in *In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, MDL No. 2445, No. 13-MD-2445, Civ. A. No. 16-5073 (E.D. Pa. Dec. 3, 2021), a defendant objected to the proposed notice, relying on 42 U.S.C. § 290dd-2 and 42 C.F.R. § 2.64. The court found the notice proper, citing the protections in place to protect the privacy of the class members.[5] It concluded that the plaintiffs had "provided sufficient assurances for purposes of approval of the Amended Notice Plan," and approved the form and manner of notice to the class members. *See also*, *e.g.*, *Heredia v. Tate*, No. 3:19-cv-00338-jdp (W.D. Wisc., Dec. 22, 2020); *Putnam v. Eli Lilly & Co.*, 508 F.Supp.2d 812, 814 (C.D.Cal. 2007) (ordering disclosure of class list of employees, recognizing that "a protective order can strike the appropriate balance between the need for information and privacy concerns"); *Doe v. Meachum*, 126 F.R.D. 444, 450 (D. Conn. 1989) ("Given that disclosure is sought by professionals whose purpose it is to protect the constitutional rights of the plaintiff class, the court finds that it is more important to the interests of justice that the communications be disclosed, under the strict parameters set forth in the protective order, than that the relationship between patient and psychologist/psychiatrist be protected.").

---

[5] These protections included: (1) the experience of the third-party administrator in dealing with sensitive health information; (2) the formatting of notices to the class members as double-postcards to prevent the contents from being visible, in compliance with HIPAA; and (3) the third party administrator's commitment to "take all steps necessary to comply with its obligations under HIPAA and other relevant guidelines." MDL No. 2445, No. 13-MD-2445, Civ. A. No. 16-5073, at 6.

Third, the Court disagrees with Cenikor's assertion that Plaintiffs failed to adequate address all conditions that Defendant contends must be met prior to notice issuing here:

> (1) The court must find that other ways of obtaining the information are not available or would not be effective;
> (2) The court must find that the public interest and need for the disclosure outweigh the potential injury to the patient, the physician-patient relationship and treatment services;
> (3) The patients must be notified and be given an opportunity to be heard; and
> (4) To the extent an order is issued, that order must limit disclosure and include measures necessary to limit disclosure and seal the information from public scrutiny.

*See* 42 C.F.R. § 2.64; *see also* 42 U.S.C. § 290dd-2(b) (imposing restrictions that are implemented in these regulations). Specifically, Defendant argues that Plaintiff has failed to discuss the third and fourth conditions.

With respect to the notice condition, it would be redundant for the collective members to be sent notice that they might receive notice of this FLSA action. It would be more sensible for the FLSA notice to simply inform the class members that, if they opt into this action, they may have to provide information or testimony regarding their substance abuse history; if they do not wish to do so, they could simply do nothing. This would satisfy the notice requirement and allow the participants to make an informed choice regarding their privacy rights and potential FLSA claim against Cenikor.

With respect to the fourth requirement claimed by Cenikor—that the Court must "limit disclosure and include measures necessary to limit disclosure and seal the information from public scrutiny"—the Court can implement various safeguards to protect the privacy of the class members. Aside from a protective order, which the Court has already issued here, the parties can agree on further safeguards such as those in *Suboxone* (*see* footnote 5).

Accordingly, the Court **ORDERS** the parties to meet and confer on notice procedures that would appropriately safeguard the privacy of program participants. The parties should inform the

Court of the agreed procedures within 45 days of this Order. The Court is confident that the parties can do so without the Court's intervention.[6]

## IV. SCHEDULING ORDER

The parties have yet to identify a trial date. Entry of a scheduling order has been deferred pending the Court's ruling on certification. The Court **ORDERS** the parties to meet and confer on an amended scheduling order and jointly submit it to the Court within 45 days of this Order.

\* \* \*

Plaintiffs' Motion for Certification is **GRANTED**. The Court hereby certifies collective action under FLSA with the following class: individuals who performed work for outside businesses or individuals without monetary compensation during the primary phase of Cenikor's long-term residential program from May 2016 until the present.

The parties are **ORDERED** to meet and confer as to notice procedures and a joint scheduling order. They must submit the agreed procedures and scheduling order within 45 days of this Order.

Signed at Houston, Texas on April 6, 2022.

Keith P. Ellison
United States District Judge

---

[6] Plaintiffs points out that this is the position Cenikor took in the initial certification briefing pre-*Swales*. In its original Response, Cenikor requested "an additional briefing schedule regarding Plaintiff's proposed notice," specifically to address the privacy issue if the Court granted conditional certification. Doc. 42 at 32. Defendant now claims that the Court must take up the procedural issues related to its privacy concerns as a prerequisite to the certification determination. The Court concludes otherwise for the reasons discussed above.